1   RACHEL KREVANS (CA SBN 116421)
    RKrevans@mofo.com
2   MORRISON & FOERSTER LLP
    425 Market Street
3   San Francisco, California  94105-2482
    Telephone: 415.268.7000
4   Facsimile: 415.268.7522

5   GRANT J. ESPOSITO (admitted *pro hac vice*)
    GEsposito@mofo.com
6   MORRISON & FOERSTER LLP
    250 West 55th Street
7   New York, NY  10019-9601
    Telephone: 212.468.8000
8   Facsimile: 212.468.7900

9   Attorneys for Defendant
    SANDOZ INC.

10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                     SAN FRANCISCO DIVISION
13

14   AMGEN INC. and AMGEN                  Case No. 3:14-cv-04741-RS
     MANUFACTURING, LIMITED,
15                                         **DEFENDANT SANDOZ INC.'S NOTICE
                        Plaintiffs,        OF MOTION AND CROSS-MOTION
16                                         FOR JUDGMENT ON THE PLEADINGS;
            v.                             MEMORANDUM OF POINTS AND
17                                         AUTHORITIES IN SUPPORT
     SANDOZ INC., SANDOZ INTERNATIONAL     THEREOF; AND OPPOSITION TO
18   GMBH, and SANDOZ GMBH,                AMGEN'S MOTION FOR JUDGMENT
                                           ON THE PLEADINGS**
19                      Defendants.
                                           Date:      March 12, 2015
20                                         Time:      1:30 p.m.
                                           Crtrm:     3, 17th Floor
21
                                           Judge:  The Honorable Richard Seeborg
22
                                           Date Action Filed:  October 24, 2014
23

24

25

26

27

28

1  **NOTICE OF MOTION AND MOTION**

2  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3        PLEASE TAKE NOTICE that on March 12, 2015, at 1:30 p.m., Defendant Sandoz Inc.

4  ("Sandoz") will and hereby does move this Court for an order pursuant to 28 U.S.C. §§ 2201 and

5  2202 and Federal Rule of Civil Procedure 12(c) that Sandoz complied with the Biologics Price

6  Competition and Innovation Act (BPCIA) and declaring:  (1) by providing notice of commercial

7  marketing to Amgen at least 180 days before it will sell its biosimilar, Sandoz followed

8  Section (*l*)(8)(A) of the BPCIA; and (2) the BPCIA permitted Sandoz not to provide Amgen with

9  its biosimilar application within twenty days of acceptance by FDA, and permitted Amgen to

10  bring the declaratory judgment action it filed here.  Sandoz also seeks an order denying Plaintiffs'

11  Motion for Judgment on the Pleadings and dismissing Plaintiffs' First and Second Causes of

12  Action with prejudice.

13        This motion will be based on this Notice, the accompanying Memorandum of Points and

14  Authorities concurrently filed herewith, the pleadings and papers on file with the Court, and such

15  other evidence and argument as may be presented at the hearing.

16

17   Dated: January 23, 2015          MORRISON & FOERSTER LLP

18

19                       By: /s/Rachel Krevans

20                         Rachel Krevans

21                       Attorneys for Defendant
                       SANDOZ INC.

22

23

24

25

26

27

28

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

1

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL STANDARD ......................................................................................... 5

III.  ARGUMENT ...................................................................................................... 5

    A.    Sandoz Followed the BPCIA's Notice-of-Commercial-Marketing Provision by Sending Notice More Than 180 Days Before the First Commercial Marketing ...................................................................... 6

    B.    The BPCIA's Patent Dispute Provisions Expressly Address the Situation, as Here, Where an Applicant Does Not Provide Its Application .......................... 9

        1.    Interpreting the BPCIA as Providing Flexibility to Resolve Patent Disputes Is the Only Interpretation Consistent With the Entire Statutory Scheme. .................................................................. 10

        2.    Amgen's View of Section (*l*) Requires That One Interpret an Act of Congress Solely by Reading a Single Provision in Isolation and Out of Context ................................................................................ 13

        3.    There Are Good Policy Reasons Why Congress Provided for a Flexible Approach to Resolving Patent Disputes. ................................... 15

        4.    The BPCIA Created Procedural Mechanisms for Resolving Patent Disputes, Which Amgen Cannot Convert into Substantive Rights.......... 17

    C.    Amgen's State-Law Claims Should Be Dismissed ............................................... 18

        1.    The UCL Claim Should Be Dismissed Because Sandoz Did Not Engage in Unlawful Activity and Congress Already Balanced the Relevant Competing Interests ................................................... 18

        2.    Amgen's Conversion Claim Should Also Be Dismissed......................... 21

    D.    Sandoz's Sixth and Seventh Counterclaims Should Not Be Dismissed .............. 22

IV.   CONCLUSION .................................................................................................. 23

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

i

1

# TABLE OF AUTHORITIES

2

Page

3  CASES

4  *Alexander v. Hillman*,
5     296 U.S. 222 (1935) ........................................................................................... 22

6  *Banko v. Apple Inc.*,
   20 F. Supp. 3d 749 (N.D. Cal. 2013) ............................................................. 8, 14

7
8  *Beaty v. FDA*,
   853 F. Supp. 2d 30 (D.D.C. 2012) ...................................................................... 14

9  *Burlesci v. Petersen*,
10     80 Cal. Rptr. 2d 704 (Ct. App. 1998) ................................................................. 21

11  *Citizens for a Better Env't v. Union Oil Co.*,
   861 F. Supp. 889 (N.D. Cal. 1994) ..................................................................... 14

12
13  *Cook v. FDA*,
   733 F.3d 1 (D.C. Cir. 2013) ................................................................................ 14

14  *Cortez v. Purolator Air Filtration Prods. Co.*,
15     999 P.2d 706 (Cal. 2000) .................................................................................... 19

16  *Davis v. Mich. Dep't of Treasury*,
   489 U.S. 803 (1989) ............................................................................................ 10

17
18  *Duncan v. Walker*,
   533 U.S. 167 (2001) ............................................................................................ 14

19  *G.S. Rasmussen & Assocs. v. Kalitta Flying Serv.*,
20     958 F.2d 896 (9th Cir. 1992) ............................................................................... 21

21  *Gen. Elec. Co. v. Marvel Rare Metals Co.*,
   287 U.S. 430 (1932) ............................................................................................ 22

22
23  *Gutierrez de Martinez v. Lamagno*,
   515 U.S. 417 (1995) ............................................................................................ 13

24  *In re Mercedes-Benz Tele Aid Contract Litig.*,
   257 F.R.D. 46 (D.N.J. 2009) .............................................................................. 20

25
26  *Lazar v. Hertz Corp.*,
   82 Cal. Rptr. 2d 368 (Ct. App. 1999) ................................................................. 18

27  *Mazza v. Am. Honda Motor Co.*,
28     666 F.3d 581 (9th Cir. 2012) ............................................................................... 20

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

ii

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3  *McCann v. Foster Wheeler LLC*,
4      225 P.3d 516 (Cal. 2010) .................................................... 20

5  *Miles, Inc. v. Scripps Clinic and Research Found.*,
       810 F. Supp. 1091 (S.D. Cal. 1993) ...................................... 22
6
   *Moore v. Regents of Univ. of Cal.*,
7      51 Cal. 3d 120, 793 P.2d 479 (Cal. 1990) ............................ 22

8  *Neitzke v. Williams*,
       490 U.S. 319 (1989) ........................................................... 5
9
   *Norwest Mortg., Inc. v. Super. Ct.*,
10     85 Cal. Rptr. 2d 18 (Ct. App. 1999) ..................................... 19

11 *Sandoz Inc. v. Amgen Inc.*,
       No. 2014-1693, 2014 U.S. App. LEXIS 22903 (Fed. Cir. Dec. 5, 2014) ............... 8
12
   *Sandoz Inc. v. Amgen Inc.*,
13     No. C-13-2904 MMC, 2013 U.S. Dist. LEXIS 161233 (N.D. Cal. Nov. 12, 2013)............ 7, 8
14
   *Schnall v. Hertz Corp.*,
15     93 Cal. Rptr. 2d 439 (Ct. App. 2000) ................................... 18

16 *Smith v. State Farm Mut. Auto. Ins. Co.*,
       113 Cal. Rptr. 2d 399 (Ct. App. 2001) .................................. 18
17
   *Town of Castle Rock v. Gonzales*,
18     545 U.S. 748 (2005) ........................................................ 13
19
   *TRW Inc. v. Andrews*,
20     534 U.S. 19 (2001) ......................................................... 14

21 *United States v. Cabaccang*,
       332 F.3d 622 (9th Cir. 2003) .............................................. 5
22
23 *United States v. Reeb*,
       433 F.2d 381 (9th Cir. 1970)............................................... 13
24
   *United States v. Wilson*,
25     503 U.S. 329 (1992) ........................................................ 15

26 *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
       200 F.3d 795 (Fed. Cir. 1999) ............................................ 23
27

28

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Washingtonian Publ'g Co. v. Pearson*,
   306 U.S. 30 (1939) ............................................................................................ 17

*Westwood Apex v. Contreras*,
   644 F.3d 799 (9th Cir. 2011) ............................................................................. 10

**STATUTES**

28 U.S.C.
   § 2201 ................................................................................................................... 5
   § 2202 ................................................................................................................... 5

35 U.S.C.
   § 271 ......................................................................................................... 6, 12, 13

42 U.S.C.
   § 262 .......................................................................................................... passim

Cal. Bus. & Prof. Code
   § 17200 ....................................................................................................... passim
   § 17203 ............................................................................................................... 19

**OTHER AUTHORITIES**

Biologics Price Competition and Innovation Act (BPCIA),
   Pub. L. No. 111-148, 124 Stat. 804 (2010)
   § 7001 ............................................................................................................ 2, 10
   § 7002 ................................................................................................................. 12

Federal Rules of Civil Procedure
   Committee Notes on Rules, 2007 Amendment .................................................. 13
   Rule 12 ................................................................................................................. 5
   Rule 13 ............................................................................................................... 22

William L. Stern, *Bus. & Prof. C. § 17200 Practice* 3:53 (Rutter Group 2014) ......................... 19

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

iv

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

## I.      INTRODUCTION

At the time of the enactment of the Biologics Price Competition and Innovation Act (BPCIA) in 2010, spending on biologic pharmaceuticals represented 21% of total medication spend ($67 billion of $307 billion), and was expected to increase materially.[1]  In response to this challenge, Congress introduced the BPCIA to create both a new regulatory pathway for the approval of biosimilar products, and patent-resolution mechanisms by which the originator of a biological medicine (the reference product sponsor or "Sponsor") and a biosimilar applicant ("Applicant") can resolve potential patent disputes prior to the launch of the biosimilar product, so that patients and the healthcare system could access affordable and effective biosimilar products as soon as possible.  In doing so, Congress struck a careful balance in the BPCIA between encouraging innovation and providing consumers with prompt access to lower-cost biosimilars.

Sandoz, as the first Applicant under the BPCIA, has used both the regulatory pathway and the patent-resolution mechanisms of the BPCIA to bring its biosimilar filgrastim product to patients.  In particular, Sandoz has used the patent dispute resolution mechanisms provided in the BPCIA to try to resolve any patent issues well in advance of its launch.

Amgen's motion raises two questions about how Sandoz has used those BPCIA mechanisms, namely:

> 1)    When can an Applicant provide its "notice of commercial marketing" to a Sponsor?
>
> 2)    How do patent disputes between Applicants and Sponsors get resolved when, as Section ($l$)(9)(C) contemplates, an Applicant does not provide the Sponsor with a copy of its application for FDA approval under BPCIA subsection (k) ("Application") within twenty days of acceptance by FDA, as described in Section ($l$)(2)(A)?

---

[1] *See* Declaration of Stephen D. Keane ("Keane Decl."), Ex. 1 at 4, 6 (IMS Institute for Healthcare Informatics, *The Use of Medicines in the United States:  Review of 2010*, at 4, 6 (April 2011), *available at* http://www.imshealth.com/deployedfiles/imshealth/Global/Content/IMS%20Institute/Static%20File/IHII_UseOfMed_report.pdf (last accessed Jan. 23, 2015)).

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

1

1   On the first question, the answer resides in the text of Section (*l*)(8)(A) of the BPCIA,

2   which states that the Applicant "shall provide notice to the reference product sponsor not later

3   than 180 days before the date of the first commercial marketing of the biological product licensed

4   under subsection (k)."  As Amgen would have this Court answer that question, Section (*l*)(8)(A)

5   creates an additional 180-day exclusivity period for Sponsors.  That interpretation finds no

6   support under this notice provision, which says nothing about exclusivity.  Rather, prior notice

7   allows the Sponsor, if it wishes, to try to halt commercial marketing by seeking a preliminary

8   injunction well before the biosimilar launches.  Amgen is unable to deny that on July 8, 2014,

9   Sandoz gave Amgen notice that it intended to commercially market filgrastim after approval by

10  FDA, which was expected within ten months.[2]

11      Amgen claims, however, that this notice was not effective under the BPCIA because it

12  was **too** early.  Amgen argues that effective notice (which is intended to provide a Sponsor with

13  time to assert its patent rights, if any) cannot be given until **after** FDA licenses the biosimilar.

14  Such an interpretation cannot be reconciled with the plain language and meaning of the statute.

15      Moreover, Amgen's attempt to read that notice provision to mean that **every** Sponsor

16  would **always** effectively obtain an automatic 180-day injunction after **every** product approval is

17  contrary to the goals of the BPCIA, which balanced the competing interests of consumer demands

18  for more affordable medical treatments and the need to protect innovation by providing (among

19  other things) clearly defined exclusivity periods to Sponsors.  *See* BPCIA § 7001(b), Pub. L.

20  No. 111-148, 124 Stat. 804 (2010) (Congress intended to develop a "biosimilars pathway

21  balancing innovation and consumer interests").[3]  In essence, Amgen's reading therefore turns a

22  notice provision into an exclusivity provision.

23      The second question is how do patent disputes between Applicants and Sponsors get

24  resolved when, as Section (*l*)(9)(C) contemplates, an Applicant does not provide the Sponsor with

26      [2] *See* Compl. ¶¶ 63, 70.

27      [3] For the Court's convenience, a copy of the BPCIA is provided.  (*See* Keane Decl. Ex. 2.)

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

2

1  a copy of its Application within twenty days of acceptance by FDA, as described in

2  Section (*l*)(2)(A)?  The answer is the very claim for patent infringement that Amgen has brought.

3      The dispute on the second question concerns whether Section (*l*) of the BPCIA provides

4  only one way to resolve patent disputes.  It does not.  Instead, Section (*l*) provides a roadmap for

5  Applicants and Sponsors as they navigate the resolution of patent disputes, which can differ in

6  material ways depending on the circumstances.  Section (*l*) expressly contemplates that in

7  different cases, Applicants and Sponsors will have different objectives and different concerns that

8  affect how to resolve patent issues between them.  That Congress wanted Section (*l*) to provide

9  such a flexible framework should come as no surprise, due to the impossibility of predicting the

10  facts that may be in play at the time of patent-dispute resolution, and the myriad ways parties can

11  disagree about intellectual property rights and how to address them.

12      There will be circumstances where the Applicant will want to provide the Sponsor a copy

13  of the Application within twenty days of acceptance by FDA, and then engage in other Section (*l*)

14  provisions by which the parties try to resolve patent disputes.  42 U.S.C. § 262(*l*)(2)-(4).  There

15  will be other circumstances, however, where it makes little sense for the Applicant to provide its

16  Application within that time period.  That decision triggers specified consequences—notably

17  including allowing the Sponsor to sue immediately to enforce patents claiming the biological

18  product, or a use thereof.  42 U.S.C. § 262(*l*)(9)(C).  Sandoz made such a choice here, the

19  consequence of which is that Amgen had the right to bring a patent infringement action

20  immediately—which it did.

21      Amgen's view that Section (*l*) provides only one way to resolve patent disputes cannot

22  control, because it is premised on a reading of individual pieces of Section (*l*) in isolation while

23  ignoring the intent and text of Section (*l*) as a whole.  Under this interpretation, Applicants must

24  supply their Applications within twenty days of acceptance by FDA to Sponsors in ***all***

25  circumstances.  But Section (*l*) as a whole deals with resolving potential patent disputes.

26  Amgen's view would require an Applicant to provide its Application even when there are no

27  patent disputes to resolve, such as where the Applicant intends to launch only after any relevant

28  patents have expired.  Furthermore, Amgen's proffered interpretation would require this Court to

1    ignore parts of Section (*l*) that expressly contemplate that an Applicant will ***not*** provide a Sponsor

2    with a copy of the Application within the twenty days.  42 U.S.C. § 262(*l*)(9)(C).

3          In addition, the relief Amgen seeks finds no place in the BPCIA.  Section (*l*) does not

4    provide Sponsors substantive rights to force Applicants to resolve patent disputes in the manner

5    Sponsors prefer.  Nor does the BPCIA award damages or impose injunctive relief if Applicants

6    choose to resolve patent issues in ways expressly permitted by Section (*l*).  Amgen's effort to

7    engraft these remedies onto the BPCIA contravenes the statutory scheme's careful balance

8    between encouraging innovation and providing consumers with prompt access to lower-cost

9    biosimilars.  In sum, because Sandoz's view of the BPCIA follows the words of the statute, is

10   consistent with the intent of Congress to provide cost-effective biosimilars to patients in the U.S.

11   in a timely manner, and honors principles of statutory construction, this Court should adopt it.

12         In its cross-motion, Sandoz seeks an order declaring that its interpretation of the BPCIA

13   controls.  Sandoz also moves to dismiss Amgen's unfair competition and conversion claims.

14   Under the correct interpretation of the BPCIA, Sandoz engaged in no unlawful conduct.  It simply

15   elected BPCIA provisions for resolving patent disputes different from the provisions Amgen

16   would have preferred.  Because that is not unlawful conduct, the predicate act for California

17   conversion and unfair competition claims does not exist and those claims should be dismissed.

18         Moreover, Amgen cannot obtain relief under its state-law claims.  First, relief under

19   California's unfair competition law is equitable, and would require this Court to recalibrate the

20   equities between the parties that Congress already balanced.  Second, Amgen's argument would

21   prevent a uniform interpretation of the BPCIA across the country.  Because California's unfair

22   competition law is unique, it could not provide a remedy where neither the Sponsor nor the

23   Applicant resides in California.  Application of California law would therefore yield different

24   outcomes under the BPCIA depending on where the parties reside.  Nothing in the BPCIA

25   suggests that is what Congress intended.

26         In short, the relief Amgen's motion seeks is inconsistent with the goals of the BPCIA.  It

27   would cause unwarranted delay in providing lower-cost, effective drugs to cancer patients, with

28   no countervailing benefits.  Amgen already has held a monopoly in the U.S. filgrastim market for

1    more than two decades, far longer than the twelve years of exclusivity provided for or intended by

2    the BPCIA.[4]  Amgen's motion should be denied and Sandoz's cross-motion should be granted.

3 **II.     LEGAL STANDARD**

4         The parties agree that the Court should issue a judgment on the pleadings pursuant to

5    Rule 12(c), based upon the existence of a dispositive, but disputed, question of law.  *See* Mot. at

6    8-9; *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a

7    claim on the basis of a dispositive issue of law.") (citation omitted).  Because the key issue here

8    involves statutory interpretation, which is a question of law, under 28 U.S.C. §§ 2201 and 2202

9    the Court can and should issue a declaratory judgment in Sandoz's favor if it construes the

10    BPCIA in the manner urged by Sandoz.  *See United States v. Cabaccang*, 332 F.3d 622, 624-25

11    (9th Cir. 2003) (the interpretation of a statute is a question of law); *Neitzke*, 490 U.S. at 326.

12 **III.    ARGUMENT**

13         Sandoz has fully complied with the BPCIA.  Sandoz followed BPCIA Section (*l*)(8)(A)

14    when it provided Amgen with notice on July 8, 2014 of its intent to sell biosimilar filgrastim upon

15    FDA approval.  And Sandoz complied with the BPCIA when it elected not to provide Amgen

16    with its Application within the twenty-day period and accepted the risk that Amgen would sue it

17    for patent infringement—as Amgen has now done.  Amgen's arguments to the contrary rely on

18    interpretations of the BPCIA that either misread provisions entirely or read them in isolation and

19    without regard to the statute as a whole, as canons of statutory construction require.

20         Properly construed, Section (*l*) provides procedural mechanisms through which the parties

21    can resolve patent disputes.[5]  It offers procedures designed to facilitate discussion prior to

22    litigation, which put limits on who can sue when and under what circumstances.  Section (*l*) also

23    recognizes that those procedures will not work in all cases.  And when they do not, Section (*l*)

24             [4] *See* 42 U.S.C. § 262(k)(7)(A).

25             [5] While the instant motion is largely limited to the meaning of Section (*l*), the BPCIA has

26 other provisions that operate independently of Section (*l*).  For example, Section (k) describes the requirements for FDA approval of a biosimilar.  *See* 42 U.S.C. § 262(k)(3) (approval requires

27 showing of biosimilarity or interchangeability, as well as Applicant's consent to inspection of manufacturing facility).

28

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

5

1    lifts those limits that would otherwise prevent immediate patent litigation.  Section (*l*) provides a

2    handy roadmap for both Applicants and Sponsors to follow as they try to resolve patent litigation

3    before FDA approval, so that once FDA approves a biosimilar, patients—and state and federal

4    governments and employers that help subsidize their care—can promptly reap the benefits of

5    more affordable medical treatment.

6         Section (*l*) does many things to help resolve patent disputes.  What it does not do,

7    however, is punish an Applicant for pursuing a patent dispute resolution process permitted by the

8    BPCIA just because the Sponsor prefers a different course of action.  Section (*l*) does not create a

9    new substantive right that could be enforced under state or federal law; rather, it simply provides

10   procedural mechanisms that, together with an amendment to 35 U.S.C. § 271(e), allow the

11   Sponsor and Applicant to litigate about substantive patent rights.  The Sponsor's substantive right

12   to try to delay entry of a biosimilar hinges solely on whether the Sponsor can succeed on a patent

13   infringement claim.  In other words, only if the Sponsor succeeds in establishing that its patent(s)

14   are valid and infringed, should the launch of a biosimilar product be delayed.

15        In any event, because Sandoz fully complied with the BPCIA, Amgen has no proper basis

16   for seeking relief under the state-law claims asserted.  For the reasons that follow, Amgen's

17   motion should be denied and Sandoz's cross-motion should be granted.

18   **A.    Sandoz Followed the BPCIA's Notice-of-Commercial-Marketing Provision by Sending Notice More Than 180 Days Before the First Commercial Marketing.**

19

20        Commercial marketing in the United States can commence as soon as FDA approves the

21   biosimilar.  Section (*l*)(8)(A) directs an Applicant to notify the Sponsor of its intent to sell "not

22   later than 180 days before the date of the first commercial marketing of the biological product

     licensed under subsection (k)."  BPCIA Section (*l*)(8)(A) states:
23

24            NOTICE OF COMMERCIAL MARKETING.—The subsection (k)
              applicant shall provide notice to the reference product sponsor not
25            later than 180 days before the date of the first commercial
              marketing of the biological product licensed under subsection (k).

26

27   Thus, the question is whether Sandoz notified Amgen of its intent to sell "not later than 180 days

28   before the date of the first commercial marketing of" biosimilar filgrastim.  The answer is yes.

1    On July 8, 2014—the day after FDA accepted Sandoz's Application—Sandoz notified Amgen

2    that it would begin to sell filgrastim upon FDA approval.

3        Despite the statute's clear pronouncement, Amgen argues that Section (*l*)(8)(A) means

4    that an Applicant cannot provide notice that it will sell the biosimilar until ***after*** FDA approves

5    the biosimilar.  Under Amgen's interpretation, Sponsors will obtain an additional six months of

6    uninterrupted market exclusivity after biosimilar approval while cancer patients wait needlessly

7    for the less expensive version of filgrastim that Congress and FDA promised them.  That

8    argument cannot be squared with either the statutory text or the entire statutory scheme.  Looking

9    at the statutory text, the "before" modifies "the date of the first commercial marketing."  The

10   "licensed" relates to the product that will be commercially marketed, ***not*** the triggering time for

11   the notice.

12       Amgen makes much of the fact that Section (*l*)(8)(A) uses the phrase "licensed under

13   subsection (k)" while other parts of the BPCIA sometimes refer to a "biological product that is

14   the subject of the subsection (k) application."  But that choice of phrase sheds no light on the

15   meaning of Section (*l*)(8)(A).  By the time commercial marketing has begun, it is irrelevant

16   whether the marketed product is referred to as "the licensed product" or "the subject of the

17   application"—because, as of the time of marketing, the product must have been approved by

18   FDA, so those phrases refer to the exact same thing.  It would have made no difference for

19   Congress to have phrased the provision as "commercial marketing of the biological product that

20   is the subject of the subsection (k) application," because that application has necessarily been

21   approved by the time marketing begins.  Thus, contrary to Amgen's arguments, Congress' choice

22   of the phrase "licensed under subsection (k)" reflects only the mundane truth that the product has

23   already been licensed by the time marketing begins.

24       Amgen's argument as to the timing of when notice of commercial marketing can issue

25   clings to dicta in the Etanercept case, *Sandoz Inc. v. Amgen Inc.*, No. C-13-2904 MMC, 2013 U.S.

26   Dist. LEXIS 161233 (N.D. Cal. Nov. 12, 2013).  In that case, Amgen never made the argument it

27   advances here.  Instead, the district court simply made statements *sua sponte* suggesting that an

28   Applicant cannot provide notice of commercial marketing until after FDA approves the

1  biosimilar. *See id.* at *6. Although Amgen eventually tried to defend those statements in the

2  Federal Circuit, the Circuit expressly stated that its holding was based on other grounds, and that

3  it did not reach the notice-timing issue. *Sandoz Inc. v. Amgen Inc.*, No. 2014-1693, 2014 U.S.

4  App. LEXIS 22903, at *2 (Fed. Cir. Dec. 5, 2014) ("We do not address the district court's

5  interpretation of the BPCIA"). Amgen's argument here cannot be reconciled with the plain

6  meaning of the statutory provision, which clearly states that notice should precede commercial

7  marketing and says nothing about the timing of such notice relative to FDA approval.

8        Under Amgen's interpretation, Section (*l*)(8)(A) is no longer a notice provision, but rather

9  an exclusivity provision. When viewed against the intent of the statute, this makes no sense.

10  Congress already decided that Sponsors should have twelve years of exclusivity, and that no

11  biosimilar application could be submitted to FDA for approval until after the Sponsor's product

12  had been on the market for four full years. 42 U.S.C. § 262(k)(7).

13        Section (*l*)(8)(A) does not provide an additional six months of market exclusivity. Rather,

14  it was intended to provide 180 days for Sponsors to seek an injunction against marketing by

15  proving to a court that they have met the traditional test for a preliminary injunction. But

16  Amgen's view of Section (*l*)(8)(A) would effectively give all Sponsors a six-month preliminary

17  injunction after approval for every biosimilar—even if they have no patents covering the

18  product—without meeting the high burden for obtaining such an injunction. Nothing in the

19  BPCIA dispenses with the need for meeting the rigorous test for judicial approval of a

20  preliminary injunction. Amgen cannot extend its monopoly by waiting for FDA approval and

21  then having an additional six months to assert its patent rights while patients wait on the sidelines

22  and governments and companies continue to endure higher prices to treat their citizens and

23  employees.

24        If the section read as Amgen urges, Congress would have simply said: "The

25  subsection (k) applicant shall provide notice to the reference product sponsor after FDA approval

26  and cannot begin commercial marketing until 180 days after providing such notice." Congress

27  did not, and Amgen's argument should be summarily rejected. *See Banko v. Apple Inc.*, 20 F.

28  Supp. 3d 749, 757 (N.D. Cal. 2013) (correct interpretation of statute cannot ignore the plain

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

8

1  language of that statute, and "must give effect to the unambiguously expressed intent of

2  Congress") (citation omitted).

3       It is much more consistent with the goals of the BPCIA to read Section (*l*)(8)(A) as simply

4  calling for no less than six months' notice before marketing, without waiting first for approval.

5  That gives both parties and the judicial system six months to litigate and decide whether a

6  preliminary injunction based on patent rights is warranted **before** a biosimilar is approved and

7  would otherwise be ready for launch.  If the Sponsor cannot meet the traditional requirements for

8  an injunction, consumers can benefit from the lower-cost biosimilar as soon as it is approved by

9  FDA.  On the other hand, if a court decides that an injunction is appropriate, patent rights will be

10  protected and the Applicant will not be able to launch unless and until the injunction is lifted.

11  That outcome reflects the balance struck by Congress in the BPCIA between these competing

12  interests.

13       Amgen's effort to read into Section (*l*)(8)(A) a further delay in the sale of affordable

14  biosimilars, if adopted, would have far-reaching consequences.  Not only would that

15  interpretation improperly force this Court to re-evaluate the balance Congress already struck in

16  providing exclusivity to promote innovation, but it would also impose a massive cost on the

17  healthcare system by needlessly delaying the entry of more affordable medicines that FDA

18  approved for sale.  Amgen's effort to amend Section (*l*)(8)(A) to impose such a requirement—

19  especially where the text says nothing about exclusivity—should be rejected.

20       The Court should therefore hold that (a) Applicants do not have to wait to provide notice

21  of commercial marketing until after FDA approves their biosimilars, and (b) Section (*l*)(8)(A)

22  does not award Sponsors an additional six months of exclusivity.

23      **B.**    **The BPCIA's Patent Dispute Provisions Expressly Address the Situation, as Here, Where an Applicant Does Not Provide Its Application.**

24

25       Section (*l*) deals with how to resolve patent disputes between Applicants and Sponsors.

Those provisions provide flexibility to resolve patent disputes, depending on the circumstances.

26

27  Contrary to Amgen's argument, Section (*l*) does not impose only a single or exclusive way to

resolve patent disputes.

28

Sandoz Inc.'s Cross-Motion for Judgment on the Pleadings and Opposition to Amgen's Motion
Case No. 3:14-cv-04741-RS
sd-655391

9

**1.      Interpreting the BPCIA as Providing Flexibility to Resolve Patent Disputes Is the Only Interpretation Consistent With the Entire Statutory Scheme.**

That the BPCIA provides for ways to resolve patent issues besides the approach Amgen prefers in this case is the only reading consistent with the entire statutory scheme.  A fundamental canon of statutory construction is that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (citation omitted).  In interpreting the language of a statute, "it is inappropriate to construe a statute by reading related clauses in isolation or taking parts of a whole statute out of their context.  An excerpted clause in a statute cannot be interpreted without reference to the statute as whole . . . ."  *Westwood Apex v. Contreras*, 644 F.3d 799, 804 (9th Cir. 2011) (citing *United States v. Morton*, 467 U.S. 822, 828 (1984)).  Providing alternate approaches to resolving patent issues reflects Congress' intent to provide the flexibility needed to achieve the BPCIA's primary purpose:  striking a balance between protecting consumer interests by efficiently getting biosimilar products to market, and protecting innovation by providing mechanisms to resolve potential patent disputes.  *See* BPCIA, § 7001(b), Pub. L. No. 111-148, 124 Stat. 804 (2010) (Congress intended to develop a "biosimilars pathway balancing innovation and consumer interests").  The text of the statute provides for more than one mechanism precisely in order to achieve that balance.

Specifically, Section (*l*) of the BPCIA creates a set of procedures that Applicants and Sponsors can use to resolve potential patent disputes, with different methods of resolution depending on how each elects to proceed under the circumstances.  Under the statute, one election that the Applicant can make is to provide the Sponsor a copy of the Application within twenty days of acceptance by FDA under Section (*l*)(2)(A), and then to exchange lists of patents that might be relevant and negotiate any resulting disputes before commencing patent litigation (the "Patent-Exchange Process").[6]  An Applicant's provision of its Application to the Sponsor carries

---

[6] The procedures for identifying and negotiating patent disputes after receipt of the Application are contained in 42 U.S.C. § 262(*l*)(3)-(4).

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

10

1   certain risks and benefits for both the Applicant and the Sponsor. For example, during the Patent-

2   Exchange Process the Sponsor cannot immediately run to court and sue the Applicant for

3   infringing a patent covering its branded drug or how it is used.

4        But the text of Section (*l*) makes clear that providing the Application within twenty days

5   of acceptance by FDA is not the only way that patent disputes can be resolved. Another election

6   the Applicant can make is ***not*** to provide its Application within that time period. That is the plain

7   meaning of Section (*l*)(9)(C) of the BPCIA, which is entitled "SUBSECTION (k)

8   APPLICATION NOT PROVIDED" and states:

9           If a subsection (k) applicant fails to provide the application and
            information required under paragraph (2)(A), the reference product

10          sponsor, but not the subsection (k) applicant, may bring an action
            under section 2201 of title 28 for a declaration of infringement,

11          validity, or enforceability of any patent that claims the biological
            product or a use of the biological product.

12

13  42 U.S.C. § 262(*l*)(9)(C). If the Applicant proceeds under this provision, different risks and

14  benefits emerge, including the fact that the Sponsor can sue ***immediately*** to enforce valid patents

15  claiming its drug, or its use—as Amgen has done here.

16       Interpreting the provisions of Section (*l*) as a whole means that ***if*** the Applicant wishes to

17  take advantage of the Patent-Exchange Process described in Sections (*l*)(2)-(6), ***then*** the

18  Applicant ***must*** supply the Application to the Sponsor within twenty days of its acceptance by

19  FDA. But that is not the only way to resolve patent disputes under the BPCIA.

20       Specifically, Section (*l*) explains how patent litigation between the Applicant and the

21  Sponsor should occur depending on how the Applicant proceeds. Under Section (*l*)(9)(A), if the

22  Applicant shares its Application within twenty days of FDA acceptance and engages in the

23  Patent-Exchange Process—potentially culminating in a limited suit for patent infringement under

24  Section (*l*)(6)—***neither*** party may bring an action for declaratory judgment for infringement,

25  validity, or enforceability of patents before the Applicant provides its notice of commercial

26

27

28

1  marketing.[7]  Under Section (*l*)(9)(B), if the Applicant shares its Application, begins the

2  Patent-Exchange Process, and then chooses not to continue, the Sponsor can bring traditional

3  patent litigation at a time of its choosing.

4       If, on the other hand, the Applicant does not share the Application within the twenty-day

5  period for whatever reason, Section (*l*) points to the next step in the process to cover that

6  scenario:  Section (*l*)(9)(C) authorizes the Sponsor—but *not* the Applicant—to bring a declaratory

7  judgment action of infringement, validity, or enforceability at any time, as Amgen has now done.

8  Sections (*l*)(9)(B) and (*l*)(9)(C) put to rest any notion that a Sponsor has the right or the ability to

9  force the Applicant to engage in the Patent-Exchange Process.  That is because they expressly

10  acknowledge that the Applicant has the right not to turn over its Application within twenty days

11  of FDA acceptance, which starts the Patent-Exchange Process, as well as the right to walk away

12  from that process even after the Applicant has chosen to begin it.  In any event, Sandoz complied

13  with the BPCIA when it refused to give Amgen a copy of its Application within the twenty-day

14  period.  And Amgen complied with the BPCIA when it followed Section (*l*)(9)(C) and sued

15  Sandoz for infringement of the '427 patent.

16       That there are different mechanisms to resolve potential patent disputes under Section (*l*)

17  is further supported by the fact that Congress passed, as part of the BPCIA, a conforming

18  Amendment to 35 U.S.C. § 271(e), which governs patent infringement actions.  BPCIA

19  § 7002(c).  Specifically, Congress added new subsection (C) to § 271(e)(2) to account for

20  situations like the one before this Court, where the Applicant does *not* provide its Application to

21  the Sponsor.  That new subsection specifies in pertinent part that "an application seeking approval

22  of a biological product" is an act of infringement "for a patent that could be identified pursuant to

23  [262(*l*)(3)(A)(i)]" "*if the applicant for the application fails to provide the application* and

24  information required under section [262(*l*)(2)(A)]."  BPCIA § 7002(c)(1)(A)(iii), codified at

25  35 U.S.C. § 271(e)(2)(C)(i)-(ii) (emphasis added).

26  _____
       [7] Declaratory judgment actions under Section (*l*)(9)(A) are limited to patents that were
27  included on the lists the parties shared during the Patent-Exchange Process, but that were not
   previously asserted against the Applicant under Section (*l*)(6).

28

1    This additional act of Congress further demonstrates that Congress considered and

2    addressed ways to resolve patent disputes when Sponsors do not receive those Applications.

3    Together, BPCIA Section (*l*)(9)(C) and the new addition to Section 271(e) create a process for the

4    Sponsor to follow when the Applicant chooses not to provide the Application.  Section (*l*)(9)(C)

5    allows the Sponsor to bring an action for declaratory judgment.  At the same time,

6    Section 271(e)(2)(C)(ii) ripens the dispute for adjudication by making it an act of infringement to

7    submit an Application if the Applicant elects not to provide that application to the Sponsor.  Read

8    as a whole, these provisions make it unmistakably clear that the BPCIA provides more than one

9    way to resolve patent disputes.

10
11
      **2.**      **Amgen's View of Section (*l*) Requires That One Interpret an Act of Congress Solely by Reading a Single Provision in Isolation and Out of Context.**

12    Notwithstanding Congress' clear intent, Amgen clings to a myopic view of

13    Section (*l*)(2)(A), arguing that because the statute contains "shall", Applicants must supply their

14    Applications in all circumstances.  Read within the context of the BPCIA as a whole, however,

15    the word "shall" in Section (*l*)(2)(A) simply directs the first step in the Patent-Exchange Process,

16    *if* the Applicant chooses that approach to resolve patent issues.  The word "shall" is often used to

17    convey permissive conduct, especially when the surrounding context supports that use.[8]

18    As noted above, Section (*l*)(9)(C) expressly contemplates that some Applicants will not

19    disclose their Applications within the twenty days in every case, and supplies the steps that

20    follow.  By suggesting, contrary to the very text of Section (*l*)(9)(C), that Applicants must always

21

22
[8] *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) ("Though 'shall' generally means 'must,' legal writers sometimes use . . . 'shall' to mean 'should,' 'will,' or even 'may.'"); *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760-62 (2005) (provision containing the word "shall" did not require that legal action be taken, in light of policy considerations favoring discretion); *United States v. Reeb*, 433 F.2d 381, 383 (9th Cir. 1970) ("The interpretation of [shall and may] depends upon the background circumstances and context in which they are used and the intention of the legislative body . . . which used them."); Fed. R. Civ. P. Committee Notes on Rules, 2007 Amendment (explaining that the Federal Rules were amended in 2007 to "minimize the use of inherently ambiguous words," including the word "shall," which "can mean 'must,' 'may,' or something else, depending on context.  The potential for confusion is exacerbated by the fact that 'shall' is no longer generally used in spoken or clearly written English.").

28

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

13

1    turn over their Applications, Amgen's argument essentially ignores that provision.  But

2    Section (*l*)(9)(C) must be given full effect.  *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19,

3    31 (2001) ("a statute ought, upon the whole, to be so construed that, if it can be prevented, no

4    clause, sentence, or word shall be superfluous, void, or insignificant"); *see also Duncan v.*

5    *Walker*, 533 U.S. 167, 174 (2001); *Citizens for a Better Env't v. Union Oil Co.*, 861 F. Supp. 889,

6    903 (N.D. Cal. 1994); *Banko*, 20 F. Supp. 3d at 756-57.[9]

7         Amgen's tunnel-vision interpretation of "shall" causes it to overlook the fact that the term

8    is used in other places of the BPCIA where it indisputably cannot be interpreted as mandatory,

9    because the broader context describes two alternative scenarios.  For example, Amgen describes

10   the final steps of Section (*l*) and claims they "lead[] up to a licensing agreement *or* a mandatory

11   subsection 262(*l*)(6) lawsuit."  (Mot. at 7 (emphasis added).)  Where the Sponsor can choose

12   between a license agreement and a lawsuit, such lawsuit can hardly be deemed "mandatory."

13   Likewise, where, as here, a statute permits the resolution of patent issues through a procedural

14   mechanism that delays litigation, or through a procedural mechanism that allows the Sponsor to

15   move directly to patent litigation, neither approach can be described as "mandatory" and both

16   must be interpreted as legally permitted alternatives.

17        Amgen's contention that Sandoz's interpretation "renders superfluous . . . the Patent

18   provisions of the BPCIA" (Mot. at 17) is simply wrong.  Under Sandoz's interpretation, all

19   provisions of Section (*l*) remain fully intact and available to resolve patent disputes—including

20   the procedures that brought this dispute to this Court, the procedure Amgen wished Sandoz had

21   followed, and whatever other procedures future Applicants and Sponsors may follow as they seek

22   to bridge the patent issues that divide them.  Sandoz's view is fully consistent with the flexible

23   approach to carrying out the intent and the express language of Section (*l*).

24   _____

25        [9] The cases on which Amgen relies also interpret the word "shall" by looking at the statute
     as a whole.  *See Cook v. FDA*, 733 F.3d 1, 8 (D.C. Cir. 2013) (finding "shall" to be mandatory

26   because such an interpretation "gives meaning to the [statute's] exception to that [mandatory]
     command"); *Beaty v. FDA*, 853 F. Supp. 2d 30, 38-39 (D.D.C. 2012) (finding "shall" to be

27   mandatory where the statute contained an exception that would have been rendered meaningless
     if "shall" were interpreted to be permissive).

28

1        In addition, under Amgen's reading of the statute, an Applicant would be forced to

2    disclose its highly confidential and valuable information contained in the Application in all cases,

3    even if there were no relevant unexpired patents or if the Applicant decided to avoid the cost of

4    litigation and wait to sell its biosimilar until after the Sponsor's relevant patents expired.  Forcing

5    either outcome would illogically burden both parties with additional cost but no additional

6    benefit.  Adopting Amgen's interpretation of the statute would thus violate the fundamental

7    principle that a statute should not be interpreted in a manner that yields absurd results.  *United*

8    *States v. Wilson*, 503 U.S. 329, 334 (1992) (citation omitted).

9        Simply put, Section (*l*) of the BPCIA provides a road map for both Applicants and

10   Sponsors to resolve patent disputes that will arise under different circumstances, in different

11   cases, in different places, and with differing considerations about how best to proceed.  The

12   BPCIA permitted Sandoz not to supply its Application.  Once Sandoz made that decision,

13   Section (*l*)(9)(C) provided that Amgen could immediately sue for patent infringement, and that

14   patent disputes would be resolved in court.  Amgen has done just that; it has at its disposal all of

15   the traditional patent remedies, including the right to seek in discovery Sandoz's Application, and

16   the right to seek a preliminary injunction to protect its patent rights.[10]

17       This Court should declare that Sandoz acted within its rights under the BPCIA not to

18   provide its Application to Amgen within twenty days of learning that FDA would review

19   filgrastim.

20               **3.**      **There Are Good Policy Reasons Why Congress Provided for a Flexible**

21                          **Approach to Resolving Patent Disputes.**

22        That Congress would want flexibility should not be surprising, due to the difficulty in

23   determining in advance the different facts that may apply in any one case and the myriad ways

---

[10] Sandoz has been willing to provide its Application to its direct competitor Amgen since July 2014.  Amgen, perhaps for tactical reasons, has continually refused to accept it under appropriate confidentiality restrictions.  The parties have therefore submitted competing versions of a protective order to the Court, which will resolve what level of confidentiality is appropriate. Amgen has refused Sandoz's offer to provide its Application under terms of confidentiality that Sandoz believes should apply pending the Court's ruling, which calls into question whether Amgen truly wants the Application at all.

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

15

parties can disagree about intellectual property rights and how to address them.  As an example in this context, the BPCIA prevents Applicants from seeking FDA approval until the reference drug has already been on the market for four years.  42 U.S.C. § 262(k)(7)(B).  The BPCIA provides twelve years of exclusivity.  *Id.* § 262(k)(7)(A).  In some cases, then, the parties will have eight years to work through patent disputes, and that timing will impact how both sides want to proceed.  In other cases, however, the time period between seeking approval and expiration of BPCIA exclusivity will be much shorter.  Such is the case here, where the Application was filed after the twelve-year exclusivity period had already expired.  Countless other factors can be envisioned in which the parties' rights and needs will necessitate differing approaches to resolving patent disputes.  Only a flexible approach will address all of these needs.  That is the approach Congress adopted.

Many Applicants will opt to supply their Applications and engage in the Patent-Exchange Process because it offers numerous benefits.  It allows the Applicant to preview the patents that the Sponsor believes are valid and infringed.  It also provides assurances that certain patent-infringement actions must be brought by the Sponsor within a specified timeframe.  42 U.S.C. § 262(*l*)(6).  It also allows the Applicant to control to a degree which patents are litigated.

An Applicant's election to forgo that approach to resolve patent disputes therefore brings its own set of consequences.  The Applicant forfeits the right to bring certain declaratory judgment actions and to receive full information about potentially relevant patents.  This means the Sponsor alone can choose whether and when to file a declaratory judgment action, potentially leaving the Applicant in the dark with respect to its patent rights and forcing another choice: whether to launch with the risk that it will lose a considerable investment and the proceeds from sales if the biosimilar is later found to infringe a valid patent.

An Applicant that evaluates the benefits and drawbacks of the various options may elect not to disclose its Application.  That is exactly what happened here.  Faced with confidentiality concerns about sharing its Application with Amgen, with whom it competes in the biosimilar space; having evaluated the patent landscape and concluded that Amgen did not have a valid patent covering the product or its use that could keep Sandoz's biosimilar off the market; and

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

16

1   seeking the quickest path to resolving patent disputes before FDA approval, Sandoz elected not to

2   turn over its Application and instead to run the risk that Amgen would sue it over the

3   '427 patent—a risk that was realized when Amgen filed this case.  Sandoz's election fully

4   complied with the BPCIA.

> **4.      The BPCIA Created Procedural Mechanisms for Resolving Patent Disputes, Which Amgen Cannot Convert into Substantive Rights.**

7          Amgen argues about what it perceives to be violations of the patent-dispute resolution

8   procedures contained in Section (*l*), as if they, standing alone, could cause an independent injury

9   meriting relief.  Section (*l*) of the BPCIA is not, as Amgen suggests, a criminal statute designed to

10  punish non-compliance and to protect citizens from harm.  (*Cf.* Mot. at 9.)  Rather, Section (*l*)

11  provides a road map and a flexible set of procedures to resolve patent disputes.  When Sandoz, as

12  it was permitted to do, did not provide its Application within twenty days of FDA acceptance,

13  Section (*l*) directed Amgen to bring its patent lawsuit, which it has done.  Under any permitted

14  scenario, Amgen only suffers cognizable harm here if the '427 patent is valid and Sandoz

15  infringes it.

16         To the extent Amgen wants to misinterpret the procedural choice Sandoz was free to make

17  as a "violation" of Section (*l*), the procedural "remedy"—i.e., commencing a patent infringement

18  suit—is found in Section (*l*)(9)(C).  Amgen nonetheless contends that Section (*l*)(9)(C) is "not

19  remedial."  (Mot. at 15.)  That is, at best, ironic, given that Amgen has followed Section (*l*)(9)(C)

20  in bringing this lawsuit.  Semantics aside, perhaps what Amgen meant to argue is that the

21  "remedy" in Section (*l*)(9)(C) is not to Amgen's liking.  But it is the only one Congress provided.

22  Amgen improperly tries to convert the Section (*l*) ***procedures*** for evaluating patent disputes into

23  ***substantive*** rights and then to add a remedy for that supposed "right" by seeking relief not

24  authorized by the statute.  Congress could easily have provided for restitution, or authorized an

25  injunction, or directed FDA not to approve the Application until the Applicant provided its

26  Application to the Sponsor.  Congress did not, and this Court should not add those remedies or

27  give Section (*l*) "a more drastic effect [that] would tend to defeat the broad purpose of the

28  enactment."  *Washingtonian Publ'g Co. v. Pearson*, 306 U.S. 30, 41 (1939) (refusing to read the

1    Copyright Act of 1909's deposit requirement as a mandatory prerequisite to perfecting a

2    copyright, even though statute contained remedies for failure to deposit).  As a result, the Court

3    should enter an Order rejecting Amgen's interpretation of the BPCIA, and accepting Sandoz's

4    interpretation.

5              C.        **Amgen's State-Law Claims Should Be Dismissed.**

6              Amgen's state-law claims of unfair competition and conversion are premised on an

7    assumption that Sandoz violated the BPCIA.  Because Sandoz provided notice of commercial

8    marketing under Section (*l*)(8)(A), and because BPCIA Section (*l*) provides for Amgen and

9    Sandoz to resolve their patent issues in the exact manner that brought them to this court, Sandoz

10   has not violated any laws.  Without the predicate wrongful conduct required by the state-law

11   claims Amgen asserts, those claims, which find no place in this patent dispute, should be

12   dismissed.

13             1.        **The UCL Claim Should Be Dismissed Because Sandoz Did Not Engage
                         in Unlawful Activity and Congress Already Balanced the Relevant
14                       Competing Interests.**

15             Amgen's claim under California's unfair competition law, Cal. Bus. & Prof. Code

16   § 17200 *et seq.* ("UCL"), assumes that Sandoz engaged in unlawful conduct.  But it is well

17   established that an absolute defense to a UCL claim is that the conduct has been authorized by the

18   legislature.  *See*, *e.g.*, *Schnall v. Hertz Corp.*, 93 Cal. Rptr. 2d 439, 451 (Ct. App. 2000) (finding

19   no UCL claim because "where the allegedly unfair business practice has been authorized by the

20   Legislature, no factual or equitable inquiry need be made, as the court can decide the matter

21   entirely on the law").[11]  Because, as described above, Sandoz fully complied with the BPCIA,

22   Sandoz has not violated any laws.  Therefore, the Court should dismiss Amgen's UCL claim.

23             Of equal importance, California's UCL is not the proper vehicle for this Court to right the

24   alleged wrongs of which Amgen complains.  The California legislature conferred upon courts

25             [11] *See also Smith v. State Farm Mut. Auto. Ins. Co.*, 113 Cal. Rptr. 2d 399, 414 (Ct. App.
     2001) (conduct cannot be "unlawful" for purposes of the UCL where defendant's actions do not
26   violate the law); *Lazar v. Hertz Corp.*, 82 Cal. Rptr. 2d 368, 375 (Ct. App. 1999) (plaintiff failed
     to state UCL claim based on "unlawful" conduct where court had determined defendant's conduct
27   did not violate the statute at issue).

28

1   such authority "as *may* be necessary to prevent the use or employment by any person of any

2   practice which constitutes unfair competition."  Cal. Bus. & Prof. Code § 17203 (emphasis

3   added).  Courts have characterized this ability to provide relief under the UCL as deriving from "a

4   grant of broad equitable power."  *Cortez v. Purolator Air Filtration Prods. Co.*, 999 P.2d 706,

5   717 (Cal. 2000).  To properly fashion this relief, "consideration of the equities between the parties

6   is necessary to ensure an equitable result."  *Id.*  But this Court does not need to reinvent the wheel

7   by considering the equities between the parties:  Congress has already done so.  By its own

8   express statement of intent, Congress sought to "balanc[e] innovation and consumer interests."

9   Engrafting UCL remedies onto this statutory scheme would tip the scales in favor of the Sponsor

10  and upset the balance so carefully crafted by Congress.

11       The UCL is an improper remedy for yet another reason:  it is available *only in California*.

12  California's UCL is unique among state unfair and deceptive trade practices acts because it is the

13  only such act that prohibits activity that is allegedly "unlawful" under another statute or

14  regulation.  Cal. Bus. & Prof. Code § 17200 ("[U]nfair competition shall mean and include any

15  ***unlawful***, unfair or fraudulent business act or practice" (emphasis added)).  This "bootstrapping"

16  is unique to the UCL.  *See* William L. Stern, *Bus. & Prof. C. § 17200 Practice* 3:53 (Rutter Group

17  2014) (UCL unique in permitting cause of action for violation of other law).  If Amgen were

18  permitted to enjoy the benefits of an injunction under the UCL, that remedy would be available

19  only because Amgen is a California resident, thereby creating an inconsistent framework of rights

20  dependent on the parties' residence.  *See Norwest Mortg., Inc. v. Super. Ct.*, 85 Cal. Rptr. 2d 18,

21  26-27 (Ct. App. 1999) (UCL cannot reach conduct outside California by non-California resident).

22  Amgen cites no provision in the BPCIA supporting such an outcome.

23       As for the "consumer interests" that Congress sought to balance, Congress made no

24  statement that the interests of any one state's residents should be given more or less weight than

25  those of another state's.  But application of UCL remedies would do just that.  If Amgen prevails,

26  sales of Sandoz's biosimilar cancer drug will be delayed only in California.  Amgen's drive for

27  profit has blinded it to the fact that the relief it urges here comes at the expense of cancer patients

28  in California—and  those who subsidize their care—the only consumers who will not benefit

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

19

1   from prompt access to more affordable biosimilar filgrastim.  We respectfully submit that the

2   UCL was not designed to achieve that result.

3            a.       **Amgen's Motion Fails to Demonstrate That the California UCL**
                      **Applies Here.**
4

5        Under California choice-of-law principles, California applies the three-step "governmental

6   interest analysis":  (1) whether the laws of the potentially affected jurisdictions differ; (2) if so,

7   whether there is a "true conflict" given each jurisdiction's interest in the application of its own

8   laws in the facts and circumstances of the case; and (3) if so, which jurisdiction's interests would

9   be most impaired if its laws were not applied.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581,

10  590 (9th Cir. 2012); *McCann v. Foster Wheeler LLC*, 225 P.3d 516, 527 (Cal. 2010).  Here,

11  Amgen is a resident of California; Sandoz has its principal place of business in New Jersey and is

12  incorporated in Colorado; and the cancer patients to be treated reside throughout the United

13  States.  As *Mazza* recognizes, with respect to statutes such as the UCL, states may appropriately

14  strike different balances between maximizing consumer and business welfare.  *Mazza*, 666 F.3d

15  at 592-93.

16       New Jersey courts have, for example, held that under California choice-of-law rules New

17  Jersey's interest in regulating its corporations warranted the application of New Jersey law.  *In re*

18  *Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 64 (D.N.J. 2009) ("New Jersey's interest

19  in regulating Mercedes, a corporation located within its borders, requires the application of New

20  Jersey law to Plaintiffs' consumer fraud claims under the 'government interest' choice of law test

21  utilized by California and New York.").  And both New Jersey and Colorado (and indeed, every

22  state paying medical costs for its citizens) have an evident interest in obtaining lower-cost

23  medications for cancer patients.  So do countless companies deciding whether to call California

24  their home.  Further, California's interests are not significantly impaired if New Jersey or

25  Colorado law is applied, because Amgen retains its right to enforce its '427 patent against Sandoz

26  under patent law.

27

28

## 2.      Amgen's Conversion Claim Should Also Be Dismissed.

Just as Amgen cannot replace the remedy Congress provided to resolve patent disputes with California's UCL, Amgen cannot blue-pencil the BPCIA and add a right to assert a conversion claim.  Like the failed UCL claim, a conversion claim cannot survive in the absence of unlawful conduct.  Under California law, "[t]he elements of a conversion claim are:  (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a **wrongful act** or disposition of property rights; and (3) damages." *Burlesci v. Petersen*, 80 Cal. Rptr. 2d 704, 706 (Ct. App. 1998) (citations omitted) (emphasis added).  Conversion "rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results." *Id.*  Again, because Sandoz's decision not to provide its Application to Amgen was not unlawful, Amgen's claim for conversion necessarily fails and should be dismissed.  Further, as discussed above, Amgen has not shown it has suffered any cognizable harm that would warrant a remedy under its common law conversion claim.  Any such remedy would circumvent the patent dispute resolution processes that Congress provided in Section (*l*) of the BPCIA.

In any event, Amgen does not and cannot meet the requirements for demonstrating conversion of an intangible property right.  The Ninth Circuit has interpreted California law as imposing a three-part test.  "First, there must be an interest capable of precise definition; second, it must be capable of exclusive possession or control; and third, the putative owner must have established a legitimate claim to exclusivity." *G.S. Rasmussen & Assocs. v. Kalitta Flying Serv.*, 958 F.2d 896, 903 (9th Cir. 1992).  Amgen cannot satisfy the second or third elements with respect to its biologics license application (BLA).  That is because the BPCIA expressly permits Applicants to use Amgen's BLA to file their Applications.  42 U.S.C. § 262(k)(2)(A)(iii).  If Congress allows Applicants like Sandoz to use Amgen's BLA, Amgen cannot establish an exclusive ownership interest in the BLA, nor can it establish a "legitimate claim to exclusivity."

Further, the California courts have consistently rejected theories that seek to expand conversion law, particularly where the proposed expansion seeks to (a) interfere with the balance struck by a statute, such as the BPCIA, between the interests of the putative owner of intangible

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

21

1    property rights and the interests of the public in the availability of important products and

2    technologies; or (b) end-run the requirements of patent law.  *See Miles, Inc. v. Scripps Clinic and*

3    *Research Found.*, 810 F. Supp. 1091, 1095 (S.D. Cal. 1993) (refusing to expand California law to

4    recognize a cause of action for conversion of the intangible right to commercialization of a cell

5    line); *Moore v. Regents of Univ. of Cal.*, 51 Cal. 3d 120, 143-44, 793 P.2d 479 (Cal. 1990)

6    (refusing to extend a conversion cause of action to a person's cells where physician's existing

7    statutory disclosure obligations provided plaintiff sufficient protection).  As a result, the

8    conversion claim should be dismissed.

9         **D.      Sandoz's Sixth and Seventh Counterclaims Should Not Be Dismissed.**

10        Amgen's Complaint alleges that the '427 patent is valid and infringed by Sandoz.  As is

11   customary in patent litigation, Sandoz responded with counterclaims seeking declaratory

12   judgment that the '427 patent is neither.  Amgen now argues that these counterclaims are barred

13   because, according to Amgen, Section (*l*)(9)(C)—the very section Amgen refuses to honor in

14   full—mandates that only Amgen, not Sandoz, "may file a declaratory judgment action" at this

15   juncture.  (Mot. at 24.)

16        Amgen's argument fails because ***Amgen***, not Sandoz, has brought this action.

17   Section (*l*)(9)(C) states in relevant part that "the reference product sponsor, but not the subsection

18   (k) applicant, may ***bring an action*** under section 2201 of title 28, United States Code, for a

19   [declaratory judgment] . . . ."  42 U.S.C. § 262(*l*)(9)(C) (emphasis added).  Once that action is

20   filed, traditional patent litigation rules apply.  Courts have long held that the assertion of

21   counterclaims is not "bring[ing] an action."  *Alexander v. Hillman*, 296 U.S. 222, 241 (1935)

22   (assertion of counterclaims is not commencement of a suit); *see also Gen. Elec. Co. v. Marvel*

23   *Rare Metals Co.*, 287 U.S. 430, 435 (1932) ("[O]ne who sues in a federal court of equity to enjoin

24   the infringement of his patent, thereby submits himself to the jurisdiction of the court with respect

25   to all the issues of the case, including those pertaining to a counterclaim . . . .").  Sandoz may file

26   any and all counterclaims relating to the infringement claims against it—and nothing in the

27   BPCIA suggests otherwise.  Indeed, because the counterclaims "arise[] out of the transaction or

28   occurrence that is the subject matter of the opposing party's claim," Federal Rule of Civil

SANDOZ INC.'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND OPPOSITION TO AMGEN'S MOTION
Case No. 3:14-cv-04741-RS
sd-655391

22

1    Procedure 13(a)(1) makes clear that Sandoz must assert these counterclaims or they will be

2    waived.  *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 801-02 (Fed. Cir. 1999).

3        It is curious that Amgen (a) elects not to move for relief under the '427 patent, the only

4    substantive rights Amgen has in this case; and (b) tries to limit Sandoz's proactive ability to

5    reveal this patent for what it is:  invalid and not infringed by Sandoz.  In any event, like its other

6    arguments, Amgen's argument hinges on a misinterpretation of the BPCIA.  Amgen's motion for

7    judgment against Sandoz's Sixth and Seventh Counterclaims should therefore be denied.

8    **IV.    CONCLUSION**

9        For all the foregoing reasons, Sandoz respectfully requests that the Court issue an order

10   denying Amgen's Motion for Judgment on the Pleadings, and dismissing Amgen's First and

11   Second Causes of Action with prejudice.  Sandoz also seeks an order granting Sandoz's

12   cross-motion, and entering judgment on Amgen's First and Second Causes of Action and on

13   Sandoz's First through Fifth Counterclaims.

14

15   Dated:  January 23, 2015              MORRISON & FOERSTER LLP

16

17                            By:  /s/ Rachel Krevans
                                   Rachel Krevans
18
                                 Attorneys for Defendant
19                               SANDOZ INC.

20

21

22

23

24

25

26

27

28